UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KIMBERLY S.[1],                                  )
                                                 )
          Plaintiff,                             )
                                                 )
     v.                                          )     CIVIL NO. 4:21cv55
                                                 )
KILOLO  KIJAKAZI, Acting                         )
Commissioner of Social Security,                 )
                                                 )
          Defendant.                             )

<u>OPINION AND ORDER</u>

     This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act, and Supplemental Security

Income (SSI) under Title XVI of the Act.. Section 205(g) of the Act provides, inter alia, "[a]s

part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record

including the evidence upon which the findings and decision complained of are based.  The court

shall have the power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

     The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1.　　The claimant meets the insured status requirements of the Social Security Act through December 31, 2023 (6D/1).

2.    The claimant has not engaged in substantial gainful activity since October 12, 2018, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: vertigo, migraines, fibromyalgia, obesity, right shoulder tendinitis, neuropathy, depression, anxiety, and PTSD (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently climb ramps and stairs, as well as frequently stoop, kneel, crouch and crawl. The claimant can occasionally balance. She can never climb ladders, ropes, or scaffolds, never work at unprotected heights, never around dangerous machinery with moving mechanical parts, and never operate a motor vehicle as part of her work-related duties. She is limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas. She is also limited to working environments that have no more than a moderate noise level.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 29, 1971 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act,

from October 12, 2018, through the date of this decision (20 CFR 404.1520(g)
and 416.920(g)).

(Tr. 13-23).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits,

leading to the present appeal.

Plaintiff filed her opening brief on January 18, 2022.  On March 29, 2022 the defendant

filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on

May 25, 2022. Upon full review of the record in this cause, this court is of the view that the

Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See*

*Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-

91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test

as follows:

> The following steps are addressed in order:  (1)  Is the claimant
> presently unemployed?  (2)  Is the claimant's impairment "severe"?
> (3)  Does the impairment meet or exceed one of a list of specific
> impairments?  (4)  Is the claimant unable to perform his or her
> former occupation?  (5)  Is the claimant unable to perform any other
> work within the economy?  An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present

case, Step 5 was the determinative inquiry.

Records from Plaintiff's primary care physician, Dr. Charles Tribbett, show a history of migraine headaches, insomnia, chronic pain syndrome, lumbar degenerative disc disease, anxiety, and depression. As of October 17, 2017, Plaintiff was prescribed alprazolam, venlafaxine, and duloxetine. (Tr. 382-385). Plaintiff also had trigger point injections on October 17, 2017. Records dated February 2018 reflect a medical history positive for lumbar degenerative disc disease and right lower extremity paresthesia. (Tr. 397-400).

Plaintiff was seen in the emergency department of Indiana University White Memorial Hospital on September 9, 2018, for dizziness that had worsened three days prior. She was also complaining of tinnitus. Plaintiff  reported that she had been unable to taste or smell for five weeks and had been having worsening episodes of memory loss. (Tr. 751-52). A CT scan of the head was done with unremarkable findings. Plaintiff was sent home with referrals to neurologist Cheng Du, M.D., and an otolaryngologist. (Tr. 755).

Plaintiff was first evaluated by Dr. Du on September 13, 2018. (Tr. 671-74). Plaintiff reported an abnormal sense of taste and smell which had been present for two months and had been worsening. The taste was similar to burnt popcorn. She also reported that she could not taste food. She reported dizziness and vertigo, and symptoms similar to being drunk despite no alcohol consumption. Dr. Du also noted unrelated migraines. (Tr. 671). Plaintiff was taking Meclizine with no relief. Dr. Du assessed the dizzy spells, absence of taste, and gait abnormality, and ordered further brain imaging and serology. (Tr. 673-74).

An MRI was done at IU White Memorial Hospital on September 27, 2018. The impression indicated subtle periventricular white matter signal abnormalities, suggesting a demyelinating process. No enhancing lesions were identified. (Tr. 749).

Plaintiff saw a new family practitioner, Ryan Hancock M.D., on September 25, 2018 to establish care. (Tr. 666). Plaintiff had knee pain with a recent flare and low back pain. Dr. Hancock noted a history of anxiety for 20 years, without recent counseling. Dr. Hancock renewed Plaintiff's prescriptions, as she was out of medication.

Plaintiff returned to Dr. Du on October 3, 2018 to discuss the MRI which showed possible multiple sclerosis (MS). (Tr. 662). Plaintiff reported continuing dizziness and tinnitus with occasional migraines. Dr. Du made referrals to a balance specialist and an MS specialist. (Tr. 664).

Plaintiff saw Dr. Scott Sanders at Balance MD on October 11, 2018 for evaluation. (Tr. 442). Plaintiff reported that she was dizzy every day. (Tr. 441). Plaintiff also told Dr. Sanders that she had frequent migraine headaches. Dr. Sanders assessed Plaintiff with vestibular migraine (migraine associated dizziness), unsteadiness, migraine without aura and without status migrainosus. (Tr. 441) Dr. Sanders ordered vestibular function testing and an audiogram.

Audiological evaluation showed pure tone thresholds were consistent with a moderate high frequency sensorineural hearing loss (SNHL) bilaterally and a mild loss at 500 Hz in the right ear. (Tr. 455). The asymmetry ratio was 63%, which was suggestive of a vestibular abnormality of the right side. (Tr. 456). Plaintiff was noted to have had ear drum surgery on the right side at the age of 16. Upon her return evaluation on October 25, 2018, by Dr. Sanders, he noted that the vestibular function testing showed no evidence of inner ear or brain dysfunction. Given Plaintiff's history of migraine headaches, Dr. Sanders felt that she was suffering from migraine associated dizziness. (Tr. 441). His assessments were migraine without aura and without status migrainosus, not intractable, tinnitus-bilateral, sensorineural hearing loss-bilateral, and

migrainous dizziness. (*Id*.).

Plaintiff was seen by nurse practitioner Ashley Gray at IU Ferry Street Neurology on November 2, 2018 to follow up on results of recent testing. Plaintiff complained of nearly constant dizziness, intermittent vertigo, smell and taste disturbances, and constant tinnitus. (Tr. 655). Plaintiff also complained of numbness and tingling on the left side of her face and the back left side of her head, and her hands felt mildly numb and tingly. Examination findings noted mild bilateral weakness in the upper extremities. (Tr. 655-56). Ms. Gray noted that the lumbar puncture performed on October 26, 2018 did not indicate MS. (Tr. 479, 656, 714). Ms. Gray's assessment was white matter abnormality on MRI of brain (primary encounter diagnosis), dizziness, chronic non intractable headache, unspecified headache type, paresthesia of left upper extremity, paresthesia of right upper extremity, fatigue, unspecified type, and weakness of both upper extremities. Ms. Gray ordered further testing including a cervical MRI.

The cervical spine MRI on November 16, 2018 showed tiny areas of enhancement seen only on the sagittal images in the cervical cord at C3/C4 and C4/C5 without corresponding signal abnormality. This was possibly mild inflammation demyelination. The radiologist noted that a follow up MRI of the cervical spine in three months may be helpful. (Tr. 709).

Plaintiff was again seen by Ms. Gray on November 20, 2018. Ms. Gray noted that Plaintiff's symptoms persisted unchanged. (Tr. 652). Plaintiff still had paresthesia (which had been somewhat improved by gabapentin), and headaches (possibly tension related). Ms. Gray noted that Plaintiff was frustrated about her symptoms, as treatments were not helping. Plaintiff was very dizzy; motion sickness was especially a problem and riding in cars was extremely difficult as she got extremely nauseated. Plaintiff felt fatigued all day long and had to rest when

7

going up and down stairs. Plaintiff was not sleeping well; falling asleep and staying asleep were both problems. She complained of only getting two hours of sleep the night prior. (*Id*.) Ms. Gray noted that the MRIs of the brain and cervical spine both show small areas of enhancement. The lumbar puncture was normal, besides mildly elevated ACE and increased cerebral spinal fluid pressure of 24 cm of water. (Tr. 639).

On December 19, 2018, Plaintiff again saw Dr Du. Plaintiff reported that she had seen the MS specialist in Indianapolis and also had testing with Dr. Sanders. (Tr. 648-49). Plaintiff continued to have dizzy spells. Dr. Du was concerned about the insomnia and how it impacted current symptoms. Dr. Du also ordered tilt table testing, referred Plaintiff to a sleep specialist, and prescribed Depakote to help with the headaches. Dr. Du's diagnostic assessment was dizzy spells, anxiety, insomnia, abnormal brain MRI, and headache disorder. (Tr. 651). Plaintiff underwent tilt table testing on December 26, 2018, which was positive for postural dizziness. (Tr. 475).

Plaintiff returned to IU Ferry Street Neurology on January 7, 2019, following up on dizziness and headaches. The record reports that the specialist at the IU Neuroscience Center felt that the symptoms were due to a migraine variant and wanted a repeat MRI in March. (Tr. 476). Plaintiff noted pressure type headaches bilaterally, and her constant dizziness persisted. The diagnosis of complex migraine was discussed. Diagnostic assessment was updated to dizziness, migraine without aura and without status migrainosus, not intractable, chronic not intractable headache, unspecified headache type, complex migraine without status migrainosus, not intractable, elevated intracranial pressure, and white matter abnormality on MRI of brain. (Tr. 645). Plaintiff was seen in the emergency department of IU White Hospital for a migraine that lasted 5 days on February 2, 2019. (Tr. 737).

Plaintiff saw another neurologist, Dr. Scott Hoyer at IU Ferry Street, on February 5, 2012 and was evaluated for hypersomnia. Upon physical examination Dr. Hoyer noted intermittent diplopia looking straight ahead. He noted sensation intact on the right and more numbness on right to midline. Positional testing elicited vertigo when Plaintiff was laid back with her right ear down to the floor. Plaintiff had to grasp the table and she had nystagmus. Dr. Hoyer noted vertigo with right ear dependent. Dr. Hoyer also noted mild problems with tandem gait. (Tr. 641-42). The diagnoses were hypersomnia, obstructive sleep apnea syndrome, circadian rhythm sleep disorder, delayed sleep phase type, migraine without aura and without status migrainosus, not intractable, vertigo, history of anxiety disorder, and history of depression. (Tr. 642). Dr. Hoyer ordered a sleep study.

Plaintiff had another brain MRI at IU White Hospital on February 15, 2019 due to dizziness, and possible demyelinating lesions on prior studies. (Tr. 735). The report noted a persistent pattern of subtle periventricular white matter signal abnormalities in both parietal lobes. Demyelinating plaques could not be excluded given the appearance and distribution. The differential diagnosis would include vasculitis, migraine syndromes, and small vessel ischemic changes. (Tr. 735).

Dr. Du referred Plaintiff to Dr. Gena Kidd, an opthamologist, for further evaluation of her migraine headaches and dizziness. Plaintiff saw Dr. Kidd on February 21, 2019. Plaintiff reported to Dr. Kidd that she had headaches every day and migraines at least twice a week and has been dizzy since August. Dr. Kidd reported that " Pt is seen today due to high LP pressures and increased migraines. Examination findings are noncontributory to symptoms. Healthy examination, no signs of stress on optic nerves, good IOPs and healthy DEE." Dr. Kidd's

9

diagnosis was pseudotumor cerebri syndrome. (Tr. 459-61).

Plaintiff was seen for evaluation by Dr. Michael Lockwood at IU Ferry Street Rheumatology on April 2, 2019. (Tr. 781-82). They discussed her dizziness, feeling drunk, and shoulder pain. On examination Dr. Lockwood noted shoulder pain, noting that Plaintiff was tender with palpation of the trapezius, bicep tendons, right greater than left. She was tender with range of motion, and tenderness in the right elbow and in the PIP joints of the right hand. (Tr. 781). Dr. Lockwood ordered an EMG on April 8, 2010, which showed very minimal carpal tunnel syndrome in the right hand. (Tr. 782).

Plaintiff returned to the IU Neuroscience MS center on April 16, 2019. (Tr. 804-09). Dr. David Mattson reviewed the file, noting all the MRI testing and lumbar puncture testing. On physical examination, Dr. Mattson did not believe that there was any ongoing pattern of inflammatory disease that would indicate an MS diagnosis, but was concerned about the markedly elevated ACE level in her spinal fluid. (Tr. 805-06). Dr. Mattson wanted a new ACE level done and a repeat EMG in more "subspecialty expert hands." Dr. Mattson noted that the last four months had not been good with Plaintiff experiencing a continued pattern of symptoms including dizziness, ataxic gait, head buzzing, no taste or smell, hands numb and tingly, especially on the right, Plaintiff was walking into walls occasionally, and had considerably lower right arm strength. (Tr. 804). Dr. Mattson offered to try and make Plaintiff more comfortable with a course of oral steroids. (Tr. 806).

On June 10, 2019, Plaintiff presented to her primary care physician, Dr. Hancock, for anxiety, fibromyalgia, right shoulder pain, and migraines. A referral was made for physical therapy. (Tr. 1096). On August 9, 2019, Dr. Hancock reviewed the MRI of Plaintiff's right

shoulder which showed osteoarthrosis of the right shoulder and tendinosis versus partial tearing of the supraspinatus tendon. (Tr. 1078). Dr Hancock referred Plaintiff to an orthopedist.

John Emmett, PA-C of IU Neuroscience, referred Plaintiff to physical therapy due to her persistent dizziness since October 2018. Dr. Ryan Hancock, M.D. continued that therapy for right shoulder pain in April 2019. (Tr. 1032, 1034). Plaintiff's dizziness was noted to be constant in nature, while the shoulder pain was intermittent in nature, but sharp at times, localized to the right shoulder pectoral, trapezius, and deltoids. (Tr. 1034). Associated symptoms included vertigo, nausea, unsteadiness/falls, increased heart rate, panic, lightheadedness, headaches, bilateral tinnitus, and loss of taste and smell. (Tr. 1034-35). Functionally, the physical therapist noted that walking down the stairs was very difficult for Plaintiff. Plaintiff also had difficulty putting on her pants while dressing. Functional testing performed on August 6, 2019, was positive for dizziness when transitioning to laying down from sitting, standing up from sitting, straightening from bending, sitting up from laying, turning the head right or left, rolling over (right or left in bed), and bending over. (Tr. 1079).

Physical examination revealed limited range of motion and decreased strength in both upper extremities. Specifically, flexion was 122 degrees bilaterally; abduction was 148 degrees on the left and 105 degrees on the right. Internal and external rotation maneuvers elicited "shooting pain down the arm, sleeve like" on the left. Both internal and external rotation in the right shoulder were limited to 55 degrees and elicited significant pain. (Tr. 1035). Strength was decreased to 4-/5 upon internal and external rotation of the right shoulder. Overall, right upper extremity strength was 3+/5 with symptom amplification and weakness at 3+/5 in the middle and lower trapezius/rhomboids. Cerebellar function was abnormal on finger to nose testing with the

11

eyes closed. Plaintiff's posture was observed to be forward by 20 degrees with inclination from C7 cephalad. (Tr. 1035). Cervical flexion and extension were 45 degrees on the left. Side bending was 18 degrees on the left and 28 degrees on the right, while rotation was 60 degrees on the left and 53 degrees on the right.

Despite two months of consistent physical therapy, Plaintiff did not experience any improvement in dizziness, right shoulder pain, or cervical stiffness. (Tr. 1036). Since therapy was not reducing any of Plaintiff's symptoms, she was discharged from physical therapy on September 30, 2019, with instructions to continue a home exercise program. (Tr. 1037).

On August 1, 2019, Plaintiff returned to the IU Neuroscience Center and had an EMG study of the upper and lower extremities due to numbness and tingling of the hands and feet. (Tr. 800-02). EMG results were normal with no evidence of peripheral neuropathy, myopathy, right cervical or lumbosacral radiculopathy, or right median neuropathy at the wrist. (Tr. 802).

Plaintiff was evaluated by Dr. Albert Lee at Indiana Neurology Specialty Care on July 26, 2020. (Tr. 1145). Plaintiff reported daily headaches and that when a headache gets severe, she gets dizzy and has near black out episodes with falls or collapse. Dr. Lee noted the MRIs showing white matter disease. Plaintiff had involuntary twitching affecting her hands, raising the possibility of seizure disorder versus non-epileptic spells. (*Id*.). Examination revealed recent and remote memory were intact, and mood/affect were stable. (Tr. 1146). Strength was normal in the limbs, reflexes were preserved; coordination was intact; sensation was intact; but gait and station showed unsteadiness. (*Id*.). Dr. Lee made recommendations including injections for pain relief, electroencephalogram (EEG) testing for seizure activity versus non-epileptic spells and further evaluation for treatment of back and neck pain. (Tr. 1146).

12

An EMG performed on August 13, 2020 of Plaintiff's upper extremities revealed generalized process axonal neuropathy and evidence of right-sided C6 radiculopathy. (Tr. 1144). An EMG on August 27, 2020, of the lower extremities revealed generalized neuropathy and no evidence of lumbosacral radiculopathy. (Tr. 1142).

Plaintiff had a baseline EEG study on August 27, 2020. (Tr. 1141). There was sharp wave epileptiform activity. The diagnosis was abnormal baseline EEG. There was sharp wave seizure activity seen during the recording to account for Plaintiff's symptoms. (*Id*.). Dr. Lee did a video EEG during Plaintiff's sleep on September 8, 2020, with normal findings. (Tr. 1140). Video EEG monitoring on September 16, 2020, with Plaintiff awake, was abnormal. (Tr. 1139).

During follow-up on September 22, 2020, at the neurology clinic, the notes indicate Plaintiff had seizure-like spells and altered mental state. (Tr. 1135). Examination revealed strength was normal, reflexes were preserved, coordination was intact, sensation was intact, and gait/ station showed unsteadiness. (Tr. 1136). The recommendation was for low-dose Valium for dizziness and video EEG monitoring for seizure activity versus non-epileptic spells. (*Id*).

In support of remand, Plaintiff first argues that the ALJ's evaluation of her migraines was erroneous. Plaintiff contends that the ALJ's decision is not supported by substantial evidence because her migraine headache disorder was erroneously evaluated under Listing 11.02.

If a severe impairment is present, the next step is to determine whether it meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App 1. See 20 C.F.R.§ 404.1520(d). The Listing of Impairments does not contain a specific entry for migraines or headaches; however, the SSA routinely considers these impairments under the criteria for Listing 11.02.  Thus, Plaintiff may demonstrate equivalence to Listing 11.02 by showing that her

13

migraines cause functional impairments equivalent to those described in the Listing.  The SSA issued a Policy Interpretation Ruling with an effective date of August 26, 2019, titled Evaluating Cases Involving Primary Headache Disorders, which formalized the evaluation of headache disorders for equivalence under the rubric of epilepsy and seizure disorders. SSR-19-4p. This ruling points out that Epilepsy (Listing 11.02) is the most closely analogous listed impairment for primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and may medically equal the listing. (*Id.*)

In the present case, the ALJ made  a brief reference to Listing 11.02, and gave a perfunctory conclusion that the listing was not met because "there was no seizure like activity in conjunction with the migraines as per the frequency specified in listings. " (Tr. 14). The ALJ did not discuss or evaluate Plaintiff's migraine headache symptoms or the frequency thereof in the context of the Listing. Thus, the ALJ did not apply SSR 19-4 correctly. In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). In fact, "where an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis, reversal and remand is required." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

SSR 19-4p first outlines the criteria for determining a primary headache disorder. The ALJ found at Step 2 of sequential evaluation that the migraine headaches were a severe impairment. Therefore, pursuant to the ruling, the migraine headache disorder was required to be evaluated under Listing 11.02(B) or 11.02(D). SSR 19-4 explains:

14

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p.

Plaintiff contends that the limitations from her migraine headaches are equivalent to listing 11.02B or 11.02 D. Plaintiff has been diagnosed with a migraine disorder and associated vertigo. Plaintiff's migraine headaches were diagnosed by each of the four neurologists she has treated with since onset of her chronic symptoms. She has been assessed by Dr. Cheng Du at the IU Arnett Ferry Street Neurology group, as well as Dr. Scott Hoyer and nurse practitioner Ashley Gray of that group. Plaintiff has also been diagnosed by neurologist Scott Sanders, MD and David Mattson, MD, PhD, who is the director of the Indiana University Neuroscience Center Multiple Sclerosis center. As Plaintiff was diagnosed with a primary headache disorder,

supported by MRI evidence of brain abnormality and abnormal EEGs, the application of SSR 19-4 is triggered.

Plaintiff contends that her headaches were equal in severity to paragraph B of listing 11.02 which requires dyscognitive seizures occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. The reports consistent throughout the medical records showed daily headaches, migraines two or three days a week, and constant dizziness. (Tr. 441, 459-61).  Relevant here is that the dizziness and vertigo were assessed as part of the headache disorder as migrainous symptoms. In addition to the medical notes, Plaintiff provided statements to the agency regarding her migraines and also testified as to frequency of the migraines. (Tr. 280). In the March 27, 2019 questionnaire, Plaintiff responded that she gets headaches four times week and each headache can last three to four days. She would spend those days in bed in a dark room. (Tr. 280). Plaintiff also testified at the hearing that she had headaches every day. (Tr. 88). Plaintiff explained that "it just comes on and just slams me." Plaintiff explained that the headaches hurt her ears and they ring so bad she could not hear. (*Id*.) Further, unlike many migraine cases, Plaintiff points to objective findings in multiple MRIs of her brain that showed a persistent pattern of subtle periventricular white matter signal abnormalities in both parietal lobes. The differential diagnosis of this these abnormal findings include vasculitis, migraine syndromes, and small vessel ischemic changes. (Tr. 735). Plaintiff also presented evidence of increased cerebral spinal fluid pressure and abnormal EEGs as support for the headaches. (Tr. 459-61, 80-806, 1139-1141). Thus, Plaintiff concludes that the frequency of her headaches and the level of debility caused by the headaches and associated symptoms of vertigo and tinnitus meet the requirements of 11.02, as set forth in SSR 19-4p.

16

Plaintiff further contends that the frequency and severity of her headaches equaled paragraph D of listing 11.02 which requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. Plaintiff contends that she has marked limitations adapting and managing herself. The ALJ failed to address the substantial assistance that Plaintiff requires on daily basis. Plaintiff is too dizzy to shower unsupervised and requires assistance of her mother to wash her hair due to dizziness. (Tr. 89). Because of Plaintiff's dizziness, there was great concern over falling and walking into walls. Plaintiff could no longer manage her home due to her symptoms. Plaintiff and her witness described many instances of falling and loss of balance in their testimony. (Tr. 88-93). Clearly, the ALJ failed to fully address the requirements of Listing 11.02.

Plaintiff further contends that a medical expert was required to address the issue of equivalence. The step three determination of whether a listing is met or equaled is an "ultimate question" within the purview of the ALJ, but Social Security regulations require an ALJ to consider the opinion of an expert in making this equivalency determination. *Barnett v. Barnhart*, 381 F. 3d 664 (7th Cir. 2004)("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue.") 20 C.F.R. § 404.1526. Accordingly, at a minimum, an ALJ must consider a medical consultant's assessment of the record evidence, which may come in the form of a Social Security Administration evaluation form, such as the SSA–831 disability determination form.  *Barnett*, 381 F.3d at 670. However, a review of the Disability Determination forms filed by medical consultant J.V. Corcoran M.D. on July 10, 2019, and B. Whitley, M.D., on January 2, 2020 show that the only listings considered

17

were Listing 2.07, Disturbance of Labyrinthine Vestibular Function, and Listing 12.06, Anxiety and Obsessive- Compulsive Disorders. (Tr. 116, 131). As there was no opinion rendered on the issue of Listing 11.02, the ALJ not only erred by failing to evaluate the evidence, the ALJ erred in failing to call an expert.

The Commissioner argues that Plaintiff did not meet the actual requirements of Listing 11.02 because she was not diagnosed with a seizure disorder. However, as discussed above, this is irrelevant as SSR 19-4p directs the ALJ to review whether a primary headache disorder alone or in combination with other impairments medically equals a listing. The Ruling explains:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

SSR 19-4p, ¶ 8.

The Commissioner acknowledges that there is no dispute that Plaintiff suffers from a primary headache disorder. Yet the Commissioner argues that because the ALJ found that Plaintiff's symptoms did not meet the exact language of Listing 11.02 he did not have to articulate any specific evidence supporting the finding that Plaintiff's impairments did not medically equal the Listing. The ALJ opined that the record did not show "seizure like activity." (Tr. 14). However, as Plaintiff points out, if she had exhibited seizure symptoms there would be no reason to discuss the concept of equivalence with respect to Listing 11.02. Why would the Social Security Administration issue a ruling directing that primary headache disorders be evaluated under Listing 11.02 for equivalence if a claimant could only meet the Listing by actual seizure symptoms?

As discussed above, SSR 19-4p provides standards to be used when considering migraines

18

under Listing 11.02. A claimant may demonstrate equivalence to Listing 11.02 by showing that

her migraines alone or in combination with other impairments cause functional impairments

equivalent in severity to those described in the Listing. *Cooper v. Berryhill*, 244 F. Supp. 3d 824,

828 (S.D. Ind. 2017); *see also Snow v. Berryhill*, 2019 WL 1873551, Case No. 3:18-cv-434-JD

(N.D. Ind. April 26, 2019). As the ALJ failed to properly consider Listing 11.02, and also failed

to solicit an expert medical opinion regarding the applicability of Listing 11.02 to Plaintiff's

headache disorder, remand is required on these issues.

Next, Plaintiff argues that the ALJ erred in evaluating her symptoms under Listing 2.07,

Disturbance of Labyrinthine-Vestibular Function. Plaintiff contends that her vertigo and dizziness

associated with her migraines equaled the Listing in severity. Listing 2.07 characterizes a history

of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing with both:

> A. Disturbed function of the vestibular labyrinth demonstrated by caloric or other vestibular tests, and

> B. Hearing loss established by audiometry.

The ALJ briefly addressed Listing 2.07. The ALJ stated that "claimant's vestibular testing was

completely normal. Moreover, the claimant was described as hearing well although there was no

formal testing in the record. As such, there was no hearing loss established by audiometry." (Tr.

14). This statement is false. The ALJ failed to address Plaintiff's persistent symptoms of dizziness

and vertigo, and failed to address the findings of the tilt table exams which confirmed the vertigo

issue. (Tr. 475). The ALJ also failed to address the examination findings on vertigo by Dr. Scott

Hoyer. (Tr. 641-624). Further, the ALJ incorrectly stated that there was no hearing loss

established by audiometry as Dr. Sanders performed an audiogram and reported moderate high

19

frequency sensorineural hearing loss (SNHL) bilaterally and a mild loss at 500 Hz in the right ear. (Tr. 455-56). Clearly, the ALJ's findings with respect to Listing 2.07 are cursory and factually incorrect.  In evaluating the applicability of Listing 2.07, the ALJ failed to provide the necessary rationale and misrepresented the record. Thus, remand is required on this issue.

Next, Plaintiff argues that the ALJ's RFC assessment is erroneous. Plaintiff contends that the RFC, which limits her to "light work",  fails to include any limitations due to her migraine headaches, except for a noise reduction. (Tr. 20). While the ALJ found Plaintiff's migraine headaches to be a severe impairment, he failed to address the functional limitations of the headaches in the RFC. Likewise the ALJ failed to account for Plaintiff's vertigo and dizziness in the RFC. The ALJ does not explain how a person with nearly constant migraine headaches, coupled with vertigo and dizziness, could perform light work, as per the RFC.

The ALJ failed to confront evidence from multiple neurologists that Plaintiff was suffering from debilitating migraines and was unable to perform basic activities of daily living. Instead of reviewing the evidence of the tilt table test, the clinical exams, and the other medical care Plaintiff has received, the ALJ placed his reliance on the outdated opinion of the state agency medical consultant, Dr. B. Whitley, finding it to be persuasive. (Tr. 19, 122-35).  However Dr. Whitley's limited evaluation was drafted months before Dr. Lee's EMG tests of August 27, 2020, which showed generalized process axonal neuropathy in the upper extremities, and evidence of right sided C6 radiculopathy. (Tr. 1144). Dr. Whitley had also not seen the EMG which revealed generalized neuropathy in the lower extremities or the series of abnormal EEGs. (Tr. 1142-43). Additionally, a review of Dr. Whitley's opinion shows that he never evaluated the result of the tilt table exam. (Tr. 122-35). Obviously, an ALJ should not rely on outdated assessments where new

and significant diagnoses or developments reasonably could have changed the reviewing physician's opinion. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). Thus, the ALJ erroneously relied on Dr. Whitley's RFC findings, which warrants remand on this issue.

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: May 27, 2022.

s/ William C.  Lee
William C. Lee, Judge
United States District Court